IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Smurfit Holdings B.V., <br><br> Warandelaan 2 <br> Oosterhout NB <br> 4904 PC Noord-Brabant <br> Netherlands <br><br>                *Petitioner*, <br><br>   v. <br><br> The Bolivarian Republic of Venezuela, <br><br> Procuraduría General de la República <br> Av. Los Ilustres, cruce con calle <br> Francisco Lazo Martí <br> Edif. Procuraduría General de la República <br> Urb. Santa Monica - Caracas <br> Venezuela <br><br>                *Respondent*. | Civil Action No.  24-cv-2728 |

**Petition to Enforce Arbitral Award**

Petitioner Smurfit Holdings B.V. ("Smurfit") brings this action to enforce an arbitral award issued on August 28, 2024 in ICSID Case No. ARB/18/49 (the "Award") against Respondent, the Bolivarian Republic of Venezuela ("Venezuela") following arbitration proceedings conducted in accordance with the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "ICSID Convention").  Pursuant to Article 54 of the ICSID Convention and 22 U.S.C. § 1650a, arbitral awards issued under the ICSID Convention are not subject to collateral attack and must be enforced and given the same full faith and credit as if the award were a final judgment of a court in the United States.

Accordingly, Smurfit requests that this Court (1) enter an order enforcing the Award in the same manner as a final judgment issued by a court of one of the several states, and (2) enter judgment against Venezuela and in Smurfit's favor in the amount of $473,235,391 and interest thereon as specified in the Award.

A certified copy of the Award is attached as Exhibit A to the Declaration of Matthew S. Rozen ("Rozen Declaration"), Exhibit 1 hereto.  A copy of the ICSID Convention is attached as Exhibit 2.

## Parties

1. Petitioner Smurfit is a company constituted and registered under the laws of the Netherlands.  Smurfit is a subsidiary of Smurfit Westrock plc, formerly known as Smurfit Kappa Group plc ("SKG").

2. Respondent Venezuela is a foreign state within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1332, 1391(f), 1602-1611.

## Jurisdiction and Venue

3. This Court has subject-matter jurisdiction over this action pursuant to the FSIA, 28 U.S.C. § 1330(a), because this is a "nonjury civil action against a foreign state" on a claim "with respect to which the foreign state is not entitled to immunity" under the FSIA.  Pursuant to Section 1605(a)(1) of the FSIA, Venezuela is not entitled to immunity from this Court's jurisdiction in an action to enforce an ICSID Convention award because it has waived that immunity by agreeing to the ICSID Convention.  *See Tatneft v. Ukraine*, No. 18-7057, 2019 WL 2563159, at *1-2 (D.C. Cir. May 28, 2019) (per curiam); *Blue Ridge Investments, L.L.C. v. Republic of Argentina*, 735 F.3d 72, 84 (2d Cir. 2013).  Further, pursuant to Section 1605(a)(6) of the FSIA, Venezuela is not immune from suit because this is an action to enforce an arbitral award

governed by the ICSID Convention, which is a treaty in force in the United States for the recognition and enforcement of arbitral awards. *Blue Ridge*, 735 F.3d at 85.

4. This Court also has subject-matter jurisdiction pursuant to 22 U.S.C. § 1650a(b), which provides that "[t]he district courts of the United States . . . shall have exclusive jurisdiction over actions and proceedings" to enforce awards entered under the ICSID Convention. *Id*.

5. This Court has personal jurisdiction over Venezuela pursuant to the FSIA, 28 U.S.C. § 1330(b). Venue is proper in this Court pursuant to 28 U.S.C. § 1391(f)(4).

6. The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq*. does "not apply to enforcement of awards rendered pursuant to the [ICSID] convention." 22 U.S.C. § 1650a(a). Thus, the FAA's jurisdictional requirements do not apply to this action.

## The Underlying Dispute

7. Petitioner is a Dutch company that invested in the manufacturing of paper-based packaging materials in Venezuela. Award ¶ 5. For more than thirty years Petitioner held substantial assets in Venezuela through its indirectly owned subsidiaries. *Id*. ¶ 224. Between 1990 and 1996, two of Smurfit's Venezuelan subsidiaries, Reforestadora Dos, Refordos C.A. ("Refordos") and Agropecuaria Tacamajaca C.A. ("Agropecuaria Tacamajaca"), acquired over 35,000 hectares of land that was divided into 23 holdings. *Id*. ¶ 86. Refordos owned 22 of those landholdings, including La Productora, Santo Tomás, and El Piñal. Cartón de Venezuela S.A. ("Cartón"), through Agropecuaria Tacamajaca, its wholly owned subsidiary, owned one landholding. *Id*. Smurfit's business also included 3 paper mills located in Caracas, Valencia, and San Felipe, as well as 15 production facilities, including recycling plants, corrugated cardboard plants, a sack plant, and a folding carton plant. *Id*. ¶ 87.

3

8. Between 2003 and 2018, Venezuela—under then-President Hugo Chavez and his successor, Nicolás Maduro—engaged in a series of actions and omissions, including expropriation, that destroyed the value of Petitioner's investment and permanently deprived it of control over that investment. Award ¶¶ 95, 174.

9. On November 13, 2001, Venezuela enacted the Decreto Con Fuerza de Ley de Tierras y Desarrollo Agrario (the "2001 Land Law"). Through that law Venezuela created a National Land Institute ("INTI") and Regional Land Offices ("RLOs") tasked with reviewing issues of title and land use. Award ¶ 88. Although sections of the 2001 Land Law were later declared unconstitutional (*id*. ¶ 89), the INTI and RLOs remained in place and Venezuela passed a number of similar follow-on laws modifying the legal framework governing landholdings in Venezuela. Later, Venezuela enacted a new system of price controls through a 2014 Law on Fair Prices that established a maximum profit margin of 30% on the sale of consumer goods and imposed sanctions and criminal penalties for violations (*id*. ¶ 94). That law also created a National Superintendency for the Defense of Socioeconomic Rights ("SUNDDE"), which was charged with implementing that law. *Id*.

10. Proceedings were initiated before the INTI to "recover" the La Productora landholding in 2003 and the Santo Tomás and El Piñal landholdings in 2005 from Smurfit's subsidiaries. Award ¶¶ 88-96; *id*. ¶¶ 101-16; *id*. ¶¶ 117-122. On March 25, 2007, then-President Chavez announced that La Productora was being "recovered" as part of the "agrarian revolution." *Id*. ¶ 99. And it has remained under control of the INTI since then. *Id*. On October 19, 2011, the INTI initiated proceedings for the "recovery" of Santo Tomás by Venezuela, and ultimately permitted the individuals occupying the property to remain there. *Id*. ¶¶ 109-16. On March 6, 2009, President Chavez announced the government's seizure of El Piñal as part of the "agrarian

4

revolution." *Id*. ¶ 124. On October 21, 2009, the INTI took possession of El Piñal and it has remained under the control of the INTI and the individuals occupying the property since then. In December 2016, the INTI notified Refordos that it had issued a decision in August 2012 to "recover" El Piñal. *Id*. ¶¶ 126-27.

11. Between 2006 and 2018, the Venezuelan government also substantially interfered with six other of Smurfit's landholdings—Cujicito, El Hierro, La Yaguara, La Joya, Garachico, and Los Garzones—through various means, including blocking access to those landholdings, attempting to "recover" those landholdings, permitting the occupation of some or parts of those landholdings or only permitting limited use of those landholdings. Award ¶¶ 128-65.

12. In August 2018, SUNDDE began taking measures targeting Smurfit's Venezuelan business operated by Cartón and Smurfit's other Venezuelan subsidiaries, including by inspecting and occupying the business, arresting its employees (who remained in prolonged custody), imposing sanctions on Cartón, and alleging that Cartón abused its dominant market position, and engaged in price speculation, boycotting, economic destabilization and smuggling. Award ¶¶ 166-74.

13. On August 23, 2018, two of Cartón's employees were arrested and SUNDDE issued an order occupying Cartón's business and subsequently issued an order for the adjustment of its products' prices. Award ¶¶ 172-73. One employee, Mr. Luis Fernando Lugo Diaz was taken to an unofficial detention location and mistreated before being put into a municipal jail and eventually released on house arrest due to a lack of evidence to support any charges against him. *Id*. ¶¶ 490-94.

14. As a result of Venezuela's actions, on September 24, 2018 Smurfit announced that it was no longer able to carry out and exercise control over its operations, and that full

responsibility for Smurfit's Venezuelan operations and compliance with Venezuelan law passed to the State as of August 28, 2018 (the date Cartón was notified of SUNDDE's occupation order). Award ¶ 174.

15. In October 2018, the Venezuelan Minister of Labor issued several resolutions ordering the immediate occupation of Cartón and its affiliates, including Refordos and others, and announced that a special management board would be appointed to manage each entity. Award ¶ 176.

16. Meanwhile, Venezuela also failed to respond (in a timely manner or at all) to Smurfit's Venezuelan subsidiaries' tax refund requests as required under Venezuelan law. Award ¶¶ 182-87. The sale of goods and services in Venezuela is subject to value added tax ("VAT"). While taxpayers like Cartón and its affiliates had the right to deduct the VAT they paid when they bought goods or services from the VAT they charged to their customers, the "special taxpayer" regime allowed many of their customers to withhold 75 percent of the VAT payable on their purchases and remit it directly to the Venezuelan tax authority. *Id*. ¶¶ 179-181. As a result, Cartón and its affiliates had to present VAT refund requests to recoup the excess VAT that they had paid. *Id*. ¶ 182. Venezuela failed to respond to Smurfit's Venezuelan subsidiaries' VAT refund requests in a timely manner or (most often) at all, contrary to Venezuelan law. *Id*. ¶¶ 183-87, 509, 519.

17. In addition to all of this, the Venezuelan government impeded Smurfit's ability to repatriate distributable profits in a timely manner or at all. Award ¶¶ 193-99.

### International Legal Framework of Smurfit's Investment

18. Because Smurfit is a Dutch company, its investments were protected by the bilateral investment treaty between the Netherlands and Venezuela (the "Contracting Parties")—the Agreement on Encouragement and Reciprocal Protection of Investments between the Kingdom of

the Netherlands and the Republic of Venezuela (the "Netherlands-Venezuela Treaty") (Ex. 3 hereto).

19. The Netherlands-Venezuela Treaty was intended to "extend and intensify the economic relations between the [countries], particularly with respect to investments by the nationals of one Contracting Party in the territory of the other Contracting Party," and "stimulate the flow of capital and technology and the economic development of the Contracting Parties." Netherlands-Venezuela Treaty. pmbl.

20. To protect investors, the Netherlands-Venezuela Treaty contained a number of protections, including that:

   a. neither Contracting Party "shall take any measures to expropriate or nationalise investments of nationals of the other Contracting Party or take measures having an effect equivalent to nationalisation or expropriation with regard to such investments," unless taken (a) in the public interest and under due process of law; (b) in a non-discriminatory manner; and (c) with just compensation. Netherlands-Venezuela Treaty. Art. 6;

   b. each Contracting Party "shall ensure fair and equitable treatment of the investments of nationals of the other Contracting Party and shall not impair, by arbitrary or discriminatory measures, the operation, management, maintenance, use, enjoyment or disposal thereof by those nationals." *Id*. Art. 3(1); and

   c. the "Contracting Parties shall guarantee that payments relating to an investment may be transferred. The transfers shall be made in a freely convertible currency, without undue restriction or delay." *Id.* Art. 5.

21. To ensure meaningful enforcement of these obligations, Article 9(1) of the Netherlands-Venezuela Treaty provides that, "at the request of the national concerned," a dispute concerning an obligation in relation to an investment shall be "submitted to the International Centre for Settlement of Investment Disputes ["ICSID"]" for arbitration under the ICSID Convention. Netherlands-Venezuela Treaty. Art. 9(2).

22. The Netherlands-Venezuela Treaty came into force on November 1, 1993.

23. On June 1, 1995, Venezuela became a member of the ICSID Convention. Award ¶ 274. Through the Netherlands-Venezuela Treaty, Venezuela consented to arbitrate disputes arising under the Netherlands-Venezuela Treaty pursuant to the ICSID Convention and in accordance with the terms of the Netherlands-Venezuela Treaty. *Id*. ¶¶ 1, 202.

24. On April 21, 2008, Venezuela provided notice of its decision to terminate the Netherlands-Venezuela Treaty. The notice became effective on November 1, 2008. However, the Netherlands-Venezuela Treaty contained a sunset clause (Article 14(3)), providing that it would remain "effective for a further period of fifteen years," *i.e.*, until November 2023, with respect to "investments made before the date of the termination of the present Agreement." Award ¶ 273; Ex. C Art. 14.3. Venezuela's consent to arbitration thus remained in force at all times relevant to the current dispute. Award ¶¶ 310-16.

25. On January 24, 2012, Venezuela denounced the ICSID Convention, and its withdrawal became effective on July 25, 2012. Award ¶ 274. As the Tribunal found, however, "the obligations of Venezuela under the ICSID Convention as a potential party to a dispute remain unaffected by denunciation as a result of the State's unconditional 'consent to the jurisdiction of the Centre' given before denunciation." *Id*. ¶ 310; *see also id*. ¶¶ 311, 316.

## The ICSID Arbitration

26. Smurfit filed a request for arbitration against Venezuela with ICSID on December 3, 2018. *Id*. ¶ 6. ICSID registered the request on December 28, 2018, and notified the parties of the registration. Award ¶ 7.

27. A three-member ICSID arbitral tribunal (the "Tribunal") was constituted on October 21, 2019. Award ¶ 21.

28. On September 9, 2020, the Tribunal, by majority, rejected Venezuela's request for bifurcation of jurisdiction and the merits and issued a reasoned decision on the same on October 5, 2020.

29. The Tribunal conducted a five-day hearing on jurisdiction, merits, Venezuela's counterclaim and quantum on September 26-30, 2022. Award ¶ 69. The Tribunal closed the proceeding on June 11, 2024. *Id*. ¶ 84.

## The Award in Smurfit's Favor

30. On August 28, 2024, the Tribunal issued its 292-page Award by majority, with the arbitrator appointed by Venezuela, Howard Mann, signing, but dissenting in full and issuing a separate dissenting opinion. The arbitrator appointed by Smurfit, Elliot E. Polebaum, issued a concurring statement as to damages and costs.

31. As to jurisdiction, the Tribunal dismissed each of Venezuela's objections, finding that it had jurisdiction to hear the claims submitted by Smurfit. Award ¶¶ 49-114.

32. *First*, the Tribunal "reject[ed] [Venezuela's] objections that [Smurfit] did not make a protected investment under the [Netherlands-Venezuela] Treaty" prior to its termination. Award. ¶¶ 227, 246, 777(i).

9

33. *Second*, the Tribunal also rejected Venezuela's objections that Smurfit's claims "as an indirect shareholder" were inadmissible. Award. ¶ 261.

34. *Third*, the Tribunal concluded that Smurfit's "investments were made prior to the termination of the [Netherlands-Venezuela] Treaty." Award. ¶ 246.

35. *Fourth*, the Tribunal rejected Venezuela's objection that Smurfit had not validly consented to ICSID arbitration. After Venezuela denounced the Netherlands-Venezuela Treaty in 2008, but before it denounced the ICSID Convention in 2012, Smurfit had sent Venezuela a letter in 2011 expressing its advance consent to arbitration under the ICSID Convention of any future disputes that may arise under the Netherlands-Venezuela Treaty. Award ¶¶ 262, 322. Venezuela argued that this advance consent was not valid because it was issued at a time where there was no dispute between Smurfit and Venezuela. *Id*. ¶¶ 262, 265. But the Tribunal rejected this argument on two independent grounds. *First*, the Tribunal held that Smurfit's advance consent letter validly expressed Smurfit's acceptance of Venezuela's offer to arbitrate disputes under the Netherlands-Venezuela Treaty pursuant to the ICSID Convention because it was sent "before Venezuela denounced the ICSID Convention" and it "expressed [Smurfit's] consent in writing in accordance with Article 25 of the Convention." *Id*. ¶ 332. *Second*, regardless of the 2011 Letter, Smurfit also validly expressed its consent to ICSID arbitration by filing its Request for Arbitration on December 3, 2018. *Id*. ¶ 319. Although Venezuela had denounced the Netherlands-Venezuela Treaty and the ICSID Convention, both treaties remained in force in December 2018 as to pre-existing investments, such that Smurfit could consent to arbitration by timely filing the Request for Arbitration. *Id*. ¶¶ 293-319.

36. Finally, the Tribunal also found that "it ha[d] jurisdiction to award moral damages." Award. ¶ 345; *id*. ¶ 777(ii).[1]

37. On the merits, the Tribunal found that Venezuela breached the Netherlands-Venezuela Treaty in numerous ways.

38. *First*, the Tribunal found that Venezuela's seizure of Smurfit's La Productora, Santo Tomás, and El Piñal landholdings was an unlawful expropriation that violated Article 6 of the Netherlands-Venezuela Treaty. Award ¶¶ 409, 415, 424, 777(i).

39. *Second*, Venezuela's 2018 measures affecting Smurfit's business breached the same Treaty provision because they "constitute[d] an expropriation that was not taken in the public interest and was not compliant with due process of law." Award ¶ 456; *id*. ¶¶ 444, 777(ii).

40. *Third*, Venezuela committed numerous breaches of its obligation, under Article 3(1) of the Netherlands-Venezuela Treaty, to accord Smurfit's investment fair and equitable treatment, including through the "measures implemented by Venezuela for the taking of [Smurfit's] landholdings." Award ¶¶ 482, *id*. 777(iii).

41. *Fourth*, Venezuela breached this same provision "through SUNDDE's 2018 measures on Cartón, as well as through the conduct of its authorities, particularly the DGCIM [Directorate General of Military Counterintelligence], during Mr. Lugo's arrest." Award ¶¶ 494, *id.* 777(iv).

42. *Fifth*, by "systematically failing to respond to Smurfit's VAT requests" (Award ¶¶ 525, 777(v)) and "impairing the use, enjoyment, and disposal of part of Smurfit's investment

---

[1] The Tribunal also "reject[ed] jurisdiction over [Venezuela's] counterclaim" as falling outside the scope of the Netherlands-Venezuela Treaty. Award ¶ 356; *id*. ¶ 777 (iii).

11

by systematically failing to answer [Smurfit's] VAT Certificate Requests" (*id*. ¶¶ 538, 777(viii)), Venezuela committed additional breaches of Article 3(1) of the Treaty.

43. *Sixth*, Venezuela failed to accord Smurfit's investment fair and equitable treatment by "impairing the operation, management, maintenance, use, enjoyment and disposal of" Smurfit's landholdings (Award ¶¶ 534, 777(vi)) and Cartón "through arbitrary measures" (*id*. ¶¶ 535, 777(vii)). In the case of Cartón, the Tribunal noted that those measures "went even further so as to remove any possibility for [Smurfit] to act in relation to its company." *Id*. ¶¶ 535, 777(vii).

44. Finally, Venezuela breached its obligation, under Article 5 of the Netherlands-Venezuela Treaty, to "guarantee that payments relating to an investment may be transferred . . . without undue restriction or delay" by failing to permit the transfer of Smurfit's Venezuelan subsidiaries' dividends without undue restrictions or delay. Award ¶¶ 608, 777 (xi).

45. To remedy these violations, the Tribunal ordered Venezuela to pay Smurfit $394.57 million, which includes the U.S. dollar equivalent of the 1 Bolivar Venezuela was ordered to pay in moral compensation, together with interest compounded annually from August 28, 2018, until the date of the Award, August 28, 2024 (Award ¶ 777(xii)-(xiii)); and interest compounded on the damages from the date of the Award to the date of payment (*id*. ¶ 777(xiv)).[2] The Tribunal further awarded Smurfit $4,535,391.27 in costs, together with interest compounded annually from May 31, 2024, until the date of payment. *Id.* ¶ 777(xv).

**Legal Basis for Relief**

46. The ICSID Convention establishes a framework for the resolution of investment disputes between a foreign sovereign party to the Convention and a national of another State party

---

[2] The Tribunal determined the appropriate interest rate to be a rate corresponding to SKG's cost of debt. *Id*. ¶ 777(xiii) (damages); *id*. ¶ 777(xv) (fees and costs).

12


to the Convention. ICSID is the World Bank-affiliated arbitral institution that administers arbitral proceedings under the ICSID Convention, including the arbitration that resulted in the Award.

47.     The ICSID Convention provides that an award rendered under the auspices of ICSID is binding on the parties and is not subject to any appeal or to any other remedy except those provided for in the ICSID Convention itself. ICSID Convention, art. 53. Article 53 of the ICSID Convention further requires each party to an award to abide by and comply with the terms of the award except to the extent that enforcement is stayed. In short, in the absence of an order staying enforcement, an award is enforceable without delay.

48.     The ICSID Convention provides that contracting parties must "recognize an award rendered pursuant to [the] Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State." ICSID Convention, art. 54(1). The ICSID Convention further provides that a contracting state "with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state." *Id*.

49.     By unconditionally undertaking to recognize and enforce any ICSID award in its own territories pursuant to Article 54, subject only to the remedies provided for in the ICSID Convention, each Contracting State agreed that, should an award be made against it, the competent authority of another Contracting State not only has the *jurisdiction* to enforce that award, but an *obligation* under international law to do so (and where given the force of law in a particular municipal law, also a domestic law obligation). Accordingly, in becoming a State party to the ICSID Convention, and in particular pursuant to Article 54, a State submits to the jurisdiction of

the national courts of other Contracting States and/or waives any immunity from suit in those national courts at the stage of recognition and enforcement of an ICSID award.

50. The United States is a contracting party to the ICSID Convention and is therefore obligated to enforce the Award as if it were a final judgment of a court in the United States.[3] That obligation is fulfilled by 22 U.S.C. § 1650a, which provides:

> An award of an arbitral tribunal rendered pursuant to chapter IV of the convention shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States. The Federal Arbitration Act (9 U.S.C. § 1 *et seq*.) shall not apply to enforcement of awards rendered pursuant to the convention.

51. Arbitral awards issued against a foreign state pursuant to the ICSID Convention may be enforced by bringing a plenary action in federal court in compliance with the requirements for commencing a civil action under the Federal Rules of Civil Procedure, and with the personal jurisdiction, service, and venue requirements of the FSIA. *See Micula v. Gov't of Romania*, 104 F. Supp. 3d 42, 49-50 (D.D.C. 2015); *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 100, 117-20 (2d Cir. 2017).

52. Awards issued pursuant to the ICSID Convention are not subject to collateral attack in enforcement proceedings under 22 U.S.C. § 1650a. "'Member states' courts are . . . not permitted to examine an ICSID award's merits, its compliance with international law, or the ICSID tribunal's jurisdiction to render the award; under the Convention's terms, they may do no more than examine the judgment's authenticity and enforce the obligations imposed by the award." *Mobil Cerro*, 863 F.3d at 102.

---

[3] *Member States*, ICSID https://icsid.worldbank.org/about/member-states.

53. The ICSID Convention therefore "reflects an expectation that the courts of a member nation will treat the award as final." *Id.*; *see also id.* at 118 (noting that an "ICSID award-debtor . . . [is] not . . . permitted to make substantive challenges to the award"); *see also* ICSID Convention, arts. 53(1), 54(1). Consistent with this mandate, 22 U.S.C. § 1650a(a) provides that the FAA "shall not apply to enforcement of awards rendered pursuant to the convention," thereby "mak[ing] [the FAA's defenses] unavailable to ICSID award-debtors in federal court proceedings." *Mobil Cerro*, 863 F.3d at 120-21. District courts thus enforce ICSID awards without allowing substantive challenges to enforcement of the awards. *See, e.g.*, *Perenco Ecuador Ltd. v. Republic of Ecuador*, 2023 WL 2536368, at *5 (D.D.C. Mar. 16, 2023); *Tethyan Copper Co. PTY Ltd. v. Islamic Republic of Pakistan*, 590 F. Supp. 3d 262 (D.D.C. Mar. 10, 2022); *Tidewater Inv. SRL v. Bolivarian Republic of Venezuela*, No. 1:17-cv-1457, 2018 WL 6605633, at *6 (D.D.C. Dec. 17, 2018); *Duke Energy Int'l Peru Investments No. 1 Ltd. v. Republic of Peru*, 904 F. Supp. 2d 131, 132-34 (D.D.C. 2012).

## Cause of Action and Request for Relief

54. Arbitral awards issued pursuant to the ICSID Convention are subject to mandatory enforcement in the courts of the United States, which must give those awards the same full faith and credit as a final judgment issued by a state court. 22 U.S.C. § 1650a(a).

55. The Award was rendered in accordance with the ICSID Convention against Venezuela and in Smurfit's favor. Smurfit is therefore entitled to enforce the Award's pecuniary obligations against Venezuela.

56. Accordingly, Smurfit is entitled to an order (a) enforcing the Award in the same manner as a final judgment issued by a court of one of the several states, and (b) entering judgment in Smurfit's favor in the amount specified in the Award.

WHEREFORE, Smurfit requests that the Court enter an order:

(a) enforcing the Award against Venezuela in the same manner as a final judgment issued by a court of one of the several states;

(b) entering judgment against Venezuela and in Smurfit's favor in the amount of:

(i) $468.70 million in principal and pre-Award interest accrued through May 31, 2024;

(ii) Pre-Award interest on that amount at a rate corresponding to SKG's cost of debt from May 31, 2024, through August 28, 2024, compounded annually;

(iii) Post-Award interest on that amount at a rate corresponding to SKG's cost of debt from August 28, 2024, until the date of entry of judgment, compounded annually;

(iv) $4,535,391.27 in costs and attorneys' fees relating to the arbitration;

(v) Pre-Award interest on costs and attorneys' fees at a rate corresponding to SKG's cost of debt from May 31, 2024, through August 28, 2024, compounded annually;

(vi) Post-Award interest on costs and attorneys' fees at a rate corresponding to SKG's cost of debt from August 28, 2024, until the date of entry of judgment, compounded annually;

(vii) Post-judgment interest at a rate to be determined by law; and

(c) Such other relief as may be necessary and proper.

Dated: September 24, 2024

Respectfully submitted,

Robert Weigel, N.Y. Bar #1809284
rweigel@gibsondunn.com
Jason Myatt, N.Y. Bar #4450599
jmyatt@gibsondunn.com
Victoria R. Orlowski, N.Y. Bar # 4250288
vorlowski@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone:  212.351.4000
Facsimile:  212.351.4035

Matthew S. Rozen, D.C. Bar #1023209
mrozen@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Smurfit Holdings B.V.*